May it please the Court, my name is Carmen Corbin and I'm an Assistant U.S. Attorney in the District of Arizona. I represent the government in this matter. I'd like to reserve three minutes of my allotted time for rebuttal, please. Just keep track of the clock in front of you. Thank you, I will. Your Honors, the forensic examination of the defendant's laptop in this case was a lawful border search that required no reasonable suspicion. The mere fact that the laptop was moved away from the physical international border in order for it to be searched before clearing customs did not change the nature of that search from a lawful border search. The search of the laptop in Tucson was merely a continuation of the lawful border search that was initiated at the physical international border. As a border search, the examination of the defendant's laptop was reasonable per se. And it did not fall into any of the exceptions to that rule because... I'm sorry, did I understand, why did they seize it? Your Honor, when the Cotterman's crossed at the loophole port of entry, in their vehicle was found numerous cameras. I think it was three cameras and two laptop computers. I believe at the time they weren't sure whose computer was what or what computer, if any, held any contraband. Basically, both of them needed to be searched before they could be cleared by customs to enter the country. So they were looking for contraband? I believe that in this case, at least in looking at Mr. Cotterman, actually looking at all of the items, the two computers and the camera that were ultimately reviewed by the forensic examiner, they were looking for contraband. Why is the government so intent on saying there's no reasonable suspicion? I mean, what's the purpose of giving up on that when you had a flag on this guy? And now that you've said that, specifically what they were looking for? Well, Your Honor, the government did not rely on reasonable suspicion in this case, as you say. My question is why? I believe that it is close. It's a close analysis, and there were factors that indicated that this person, that there was some interest. But I believe that... But once you give up on reasonable suspicion, we have to put that out of the equation, correct? Well, again, the government did not... No, I mean, the question is yes or no. Do we put that out of the equation once the government says no reasonable suspicion? I believe that it is obviously something that the government did not pursue. However, I believe sitting on boss, this court may find any reason at this point to reverse and remand. And if it can find reasonable suspicion and feels that it exists based on the record, I believe that this court could reverse on that. But I thought you conceded, both at the court below and I think even in the appellate brief, if I recall correctly, that there was no reasonable suspicion. And if that's true, under Bauchi, you can't satisfy the second prong, can you, for an extended border search? Well, let me ask the first part of your question. I believe that... I don't believe the government has ever conceded that there was no reasonable suspicion. I think we focus on the fact we merely didn't argue it. I think it's close, and we merely did not raise it. I don't believe that we've ever conceded that it... Let's say hypothetically that you did. I'm quite certain you did. But if you... Let's say you did. Isn't that the end of the story here as far as an extended border search? You can't satisfy the second prong? As far as an extended border search, if there is no reasonable suspicion, yes. This search didn't occur at the border, at least in the whole thing. You started out, you searched this guy's computer, you got to the point where he had the locked file. He offered to open it. He said, I don't want to do that. He had somebody that came from 170 miles away, knew that he'd been a previous child abuser, I guess, had served a prison term, but went through, decided not to search it there, but said on the record that he, I think it was she, could have searched it there. They had all of the tools necessary to search the computer at the border. Do you disagree with that? At least to the effect that it was Agent Owen. But, yes, Agent Owen testified that he did have a laptop that was equipped with forensic software. There would be problems that could arise, and I believe there was also a limitation that he suggested that it would have taken a lot longer. Is that the defining point? They were there for eight hours. The government conceded there's no reasonable suspicion, or at least it hasn't pursued that on appeal. So does that mean they could have taken five days 1,000 miles away? Is there any limiting principle to what you started with, which was this is a border search, full stop, end of story? Yes, and I'm not sure if I'm answering your question directly, so please direct me if I'm not. But I believe what you're asking, are there any limitations to what is deemed reasonable under these circumstances? And I believe it's a case-by-case basis, Your Honor. I think that each of these cases should be analyzed on a case-by-case basis in the sense of what is reasonable. The search itself is reasonable, per se, because it's at the border. I thought we were talking about whether it's a border search or not, not whether it's reasonable. That's a very different inquiry. The question is, is it a border search? That's not a reasonableness question. The question is, is it a border search? And I think what Mr. McKinnon is asking is, if you take it 1,000 miles away to, I don't know, Kansas City or Chicago or San Francisco or whatever, is it still a border search? It takes five days. Yes, I'm sorry, I didn't understand your question. As long as the item is still not cleared by Cut-Done. Ten days? I'm sorry? Ten days? I think it depends on the case-by-case basis, Your Honor. I think that there are certain factors that... Well, you said as long as it's not cleared by Customs, I guess they could take a couple of years to take a look at it. That would be okay because it would still be a border search because it started at the border. Would that be your position? I believe that, Your Honor, in that line of analysis, basically, it would still be considered a border search and would be, per se, reasonable under that, at least as being a border search. However, there still becomes the analysis, which the panel majority noted as well, of whether it would be considered particularly offensive, and I believe that's where the whole reasonable analysis comes in. Aren't you talking about an extended border search? You've got three different things. You've got a border search, you've got an extended border search, and then the functional equivalent, you know, the plane from Mexico City to Kansas City in direct flight. Then you've got a functional equivalent. But I never dreamed that the government was taking the position that this is not an extended border search. You're actually claiming that the border is elastic and as long as you want to keep the computer and wherever you want to take it as long as it hasn't cleared Customs, that's okay? Yes, Your Honor, and actually, it's not an extended border search in this case, and I don't believe that I'm even claiming that the border is elastic. I believe that's what the case law pans out to be. What case do you refer to? Well, if you look at all of the functional equivalent cases I can give you. Those are different. But this is different. Do you first acknowledge that you have to look at two different concepts, functional equivalency and extended border search? Those are two separate principles, correct? They are, however, they require the same analysis. So let's stop. Are you taking the position that the inspection at this distant location is a functional equivalent of the border? Yes. At the Tucson location, I believe this would be considered a functional equivalent, a search of the functional equivalent. Basically, a search at the first practicable point. So is there a case that says if the first practical point of entry was where they entered, do you have any case that would put this forensic facility into the category of a functional border equivalent? The case that I would refer to would probably be Abuchi, and I'm not sure if I'm pronouncing that correctly. That was a case that was before this Court. And ultimately, the package that was searched in that matter was searched in Louisville, Kentucky, which was not on the physical border. It does not require a forensic exam, so that's one bit of difference. But in the sense that the item- The functional equivalent, the reason it was in Louisville was what? The item had been shipped. And this was on the way out, but it was the last practical point. It was the last border or last functional equivalent of an effective border, correct? Exactly. However, not because it happened to be inland or because it happened to be the facility at which they conducted a forensics exam, correct? Yes, and I believe the records show that the plane that would carry the item, the item would stop possibly in other locations before it left. So it wasn't the last place it would stop. It was just the last practical place where it would be searched. This property was seized at the border. So it's different than property when we're talking about a functional equivalent, but when it goes over, it's in the first stop. So you're saying that these are at the border, correct? Yes, it is. That's the physical border. And then it's a continuation. The search that continued to, I guess what could be equated as a functional equivalent in Tucson, was just a continuous search. Both of those searches- I always understood your argument to be this is a border search, not an extended border search. Exactly. It is not an extended border search. But you see, here's the problem I'm having. Maybe I'm not clear. It seems to me that the notion of a functional equivalent of a border is really that that substitutes for a border. It's not a supplement to a border. You don't get multiple borders, but it's a substitute. So if the package comes in FedEx or goes out Louisville, that's the functional equivalent of a border, because that is, in effect, where the authority is acting as a customs and border authority. But it's not a supplement. You're now saying two things. You're saying it's a border search, but then you're saying Tucson is also a functional equivalent, so there gets to be, what, a second border? Is there kind of like a piece of elastic between the border and the functional border, in your view? Actually, I believe that it's just basically focused on the fact that the item comes to the international border and it has to be cleared by customs before it enters the country. And when it was not able to be cleared, it had to be transferred to Tucson in order to be searched. So that means that really, because there's no reasonable suspicion at play now in our analysis, every single electronic device coming into the country at all the borders and all the functional equivalents are subject to extended search outside the border under your position, correct? If I understand your question, that any of these items would be, it's possible that they had to be transferred somewhere else to be searched. And there's no limit to having every single person who comes into the United States having their electronic device subject to what I guess you would call the Cotterman Rule. Well, I don't even know that it's necessarily the Cotterman Rule. I believe that this court in Arnold decided that computers and electronic devices can be searched at the border without reasonable suspicion. Yes, but that also was simply booting up the computer and it was all completed at the border. What you're saying is you can, if you need to clear it, search it to clear it for customs, you can take it into custody, seize it, move it somewhere else, keep it for as long as that takes. And on the fiction, I would suggest that it hasn't cleared customs yet. So where's the limiting principle that we're all up here searching for? Again, I believe that the limiting principle is just the reasonable analysis, whether it falls under the particularly offensive manner, whether it was searched in a particularly offensive manner. The reasonable, the offensive manner is talked about whether there's destructive of the property, the length of time, all of those types of things. And your argument is it would be case by case. Exactly, Your Honor. I believe it would be case by case. So do you agree that someone who didn't get a hit on the text alert, the customs, they did the very same thing to their computer, it would be reasonable or unreasonable? I believe, well, I... I mean, absent the text alert, absent that, you know, he had a password protected file, would this have been a reasonable action by the government or unreasonable? Well, I would say the mere search of a computer at the border, when an individual is crossing the border, is reasonable, and that's under that analysis. I understand that, but what if they had taken the computer to Tucson? Because here what seems significant is the seizure, the separation and the length of time that it took. So I'm asking you, without those two indicators, or whatever you want to call them, that don't probably rise to the level of reasonable suspicion, or else I think you would be arguing that, would this be reasonable? I believe it's a hard question to answer, Your Honor, only because I believe it's a case-by-case basis, and in some respects... Well, but in that case, in that case... In that case, I don't know. I believe that there are things that the agents at the border need to have the discretion to decide how they need to conduct the first... But what's the difference between the two cases? That's why I was going to read this. The reason I think that those are different are you noted the password protection on the files, and that is important. That's an important factor in this case, because that is also part of the reason why this search, number one, the computer had to be transferred, and number two, why it took as long as... And do you know how many people in the United States have a password-protected file on their computers? If that's the principle, I guess they'll be taking your laptop the next time you cross the border, too, presumably. Didn't Agent Owen say that typically business people do have password-protected files? More often than not, they do. Right, and I would even say that there's the case where an individual crosses, which another thing that is very common, an individual crosses with a computer, you open up the first screen, and there's a password on that first screen. That would require a forensics person to break that and to open that computer. So that's if we can't even get past, I mean, the password protection, the limitations... Well, I offered to give them the password, and I recognize that has hazards itself. But really, as you keep arguing, what you're saying is that there is no limiting principle, because virtually every computer has some password-protected file or password entry. Therefore, every computer coming across the border can be seized under the border exception, correct? Yes, and Mr. Kahneman actually... Is that your position? Yes, it can be searched. Every computer that crosses the border should be seized. If it's searched at the border, that's Arnold. The question is, can you take it away for further forensic testing and search? And I guess your answer has to be yes, given everything you've argued. Well, I think that the item itself is... Your answer is yes? Yes, because until it clears customs, until customs is satisfied that it doesn't contain contraband and that the item itself is able to be brought into the country and is lawful and... Well, let me ask you this. There's been a lot of publicity lately about the fact that, partly in our effort to contain terrorism, that the U.S. actually is moving functional equivalent or potentially functional equivalents of borders overseas, to Shannon Airport and other places. And they're on foreign territory, but they're saying, well, you're actually going to clear customs over here, clear immigration, one, it's speedier, and two, maybe if you are a terrorist or whatever, then we don't even have to let you on the airplane. In your view, if you have a U.S. citizen overseas who checks in at the Shannon Airport, would there be anything under your principles that would prevent the U.S. government from simply looking at the computer and saying, oh, we've got a password, I'm going to take your computer, have a nice flight, we'll connect you up in a week, two weeks, five days, we don't know, but we're going to take your computer. No reasonable suspicion. Would that be permissible under your view of the law? Well, Your Honor, I have to say I have not thought about that before you've asked that question, and I... You might want to think about it now that you've offered that. I think it would, I mean, clearly... If you don't have an answer to that, how about the simpler question? Well, she might have an answer. Let's see. Do you have an answer? I can try to fashion one. Basically, I believe that if that is deemed to be the functional equivalent of the international border for our country, then yes. Now, again, there does not need to be reasonable suspicion to search that computer. In reality, I think that things work a bit differently, but if there is no reasonable suspicion, they may still search that computer and detain it temporarily while it is searched to be cleared by customs. So, asking the simpler question, if the Customs Service of LAX is very busy, so what we're going to do is everybody that comes in from an international flight, just leave your computers, iPhones, Kindles, all those electronic devices, just leave them with us, and we'll get back to you when we're done with them. That would be fine, right? Again, Your Honor, I believe that that would... I'm sorry. In relation to whether it's a border search and if it's... Well, it's a border search, but I said it's a border. You can... Let's not quibble about that. You can call it LAX or you can call it Tijuana. Just pick your border. Pick your border point, okay? And let's start the discussion from there. So, let's assume this is a border. Let's say it's Tijuana. You've been through there, right? 17 lanes of traffic. And they say, we're really busy here, and just pass over your computers, your laptops, your iPads, your iPhones, your Kindles, your Nooks, everything, and we'll get back to you when we're done with them. That would be fine. I believe that would still be subject to a reasonable analysis. No, no. It's a border search. In the sense that, yes, it's per se reasonable, but then it's particularly offensive. Well, it would be particularly offensive. If you do it to one person, it's okay. If you do it to everybody, it's not reasonable. You say, look, we don't have time. We find that booting up these computers and laptops and all these things just takes a long time. It slows traffic back, syncs up to Ensenada. So, we pass a way through and just leave your laptop here. You seem interested in that idea. I see this crowd going. I'm saying, what a great idea. I didn't think of that. This would be on hand. I would not be necessarily pleased by that plan. Isn't that how customs works? I'm sorry. Isn't that how customs works? You bring goods in. They sometimes hold them for days to inspect them. Absolutely. They may not be prepared to deal with thousands of electronic devices, and the populace may not be prepared to deal with that. But I'm not sure in Fourth Amendment terms how the delay of a few days is an issue. Absolutely. That happens with cargo and ships, right? Exactly. They come in and they sit there, either on the ship or in a customs warehouse, until they're cleared. And in relation to the notion about cargo, that in particular, often is moved to a different location to be searched. So, although it may sit in one place, it may be searched at a different location before it's cleared by customs. You know, counsel, with respect, it seems to me that the government is roundly changing its position. You're talking about a different case than I read. The case that I read, the government said there was no reasonable suspicion. It conceded that. And it had an opportunity to search at the border, which it did. It seized the computer, it went in, took a look at things. But then it said, we're going to take this 170 miles from here, and we'll get it back to you. So there was a chance to search at the border. It's not Arnold. You say it's not an extended border search. You cite Abuchi, which, of course, was an extended border search, or alternatively you could claim it was the equivalent. But it wasn't a border search. It seems to me you're promulgating a new concept here, and I'd be interested, do you have any cases from any circuit, or certainly the Supreme Court, where you had a United States citizen comes into the United States at a border? No reasonable suspicion. You look at the computer of both the husband and the wife. You look at the phone, look at the cameras, all that sort of thing. A search is made there, and then you say, you know, we don't really have all the tools here. We're going to take this with us 170 miles from here. But there's an admission that you could take that. Is there any case like that at all? I don't believe there's a case directly on point. And I would say that I think Abuchi itself was actually not an extended border search. It was, but it was analyzed as a functional equivalent, and those are quite different. Yeah, well, they're not this case, though, are they? Are you claiming that this is a functional equivalent, that the 170 miles from the border is the functional equivalent of the border where you've already been and you've already searched? Yes, and the reason I say that is because the search wasn't completed at the border in this case because the item itself could not have been completely searched. It wasn't completely searched. Does the government concede that you are asking us to significantly expand the law of border searches in this case? Not at all. Not at all, Your Honor. You can't point me to any case that shows these facts. No, not those facts in particular, but I think that ultimately the case law in and of itself indicates that computers do not need reasonable suspicion to search computers at the border. I get that. I was on Arnold, but that was at the border. That was at the border. Very simple, open your computer, let's check it out right there. Bang, that's it. Some of these other cases, functional equivalent, not a problem. But here, there was a search at the border. And then your agent came and said there was an ability to do the search, but decided not to, to take it to somewhere else. And Judge McKeown is asking, how do you cabin that? What's the limitation on it? Well, I believe that Arnold in and of itself is still very similar, I would argue, because I believe there was, the court, I believe, indicated it was several hours that it took. And it's hard to necessarily say from the, and Your Honor was on that, so maybe you know more in particular. I remember it. But I read the government's brief in that case, and it does indicate that there was initial review of that computer, where there was only a photograph of two naked women that was found. And then there was a further review, which in some respects, at least under my reading of that brief, indicates it was some sort of forensic review, because they were able to note that the individual had gone to certain websites that involved child pornography. Well, he also had a flash memory in his pocket with pictures of him having sex with eight-year-old Philippine girls. Something of a tip-off. Yes. At the border. But as related to the actual search of the computer, however, I believe that that did take three hours or something to that effect. I'm not exactly sure specifically how long it took. However, the difference in that case is that, at least as far as I understand, there were no password-protected files on that computer. I mean, ultimately- Well, is that your key? That there's a password file? And as Judge Christin just pointed out, and I think so my other colleagues, probably every business person, certainly every judge, has password files. Isn't that the OJ policy, that you have to have a password-protected laptop? Isn't that the IT policy? I would assume so. Does that make you a suspect? No, and I've never argued that. I've never argued that there is just merely reasonable suspicion or that even that reasonable suspicion is necessary. But that's what you seem to be arguing. I may be misreading what you're saying. But as I understand it, the government does not take the position, indeed conceded below, that the fact that this guy had done prison time for child abuse was not sufficient to constitute reasonable suspicion. Is that correct? Again, I don't believe that I have conceded that we didn't have reasonable suspicion. Let's assume it's in the record. The only other thing you've got is this password thing. Even the password thing, I'm not arguing that to the extent of reasonable suspicion. I'm noting that fact as indicating why it would take longer and different resources- But here's where we get back, from my perspective, the government is changing this case. If you argue or if you can agree that having a password is so common in our society that it does not, under any circumstances, unless you've got some watch list or something like this, this does not constitute reasonable suspicion. And there was no other reasonable suspicion here. So your argument is wholly buttressed on the concept that without reasonable suspicion, which could involve any of the people in this audience, any of us on the bench, that the government can, at the border, say, as the Chief Judge indicated, you know, we'd just like to take a look at what you've got here. Give us all your stuff. We're going to take it away and we'll let you know when we're done with it. That's a radical concept, isn't it? No, Your Honor. I believe under the case law and statutes, the customs has the full right to search what effects that people are bringing into the country to clear them whether they can be entered into the country, whether they can enter with them. So this is, from your perspective, this is a customs law issue, not a Fourth Amendment issue. To the degree they can be segregated. I'm sorry? To the degree this can be segregated, you're arguing that this is a matter of customs law and inspection as opposed to a Fourth Amendment issue. Is that correct? I'm not sure how... Maybe they're not different from your perspective. I'm just asking you whether are you basing this on some customs law? And if you are, I'd sure like to have seen it in the brief because I didn't see any. What I saw was Fourth Amendment claims by you and Fourth Amendment claims by the defendant. As I understand it, if you're asking me if I'm basing my whole argument on the ability of customs to search a computer or a fax at the border and detain them for that search is based on customs law, no, I believe that that supplements it, but it's... Okay, so the government is responding on the basis of the Fourth Amendment and the cases that we're looking at are Fourth Amendment cases, right? Yes. Okay. Yes, Your Honor. You've got two minutes. May I reserve that for the middle? Thank you, Your Honor. Okay, we're here from, I guess from the defendant. Are you splitting time? Yes, Your Honor. Okay. I'm taking 20 minutes and Mr. Handman will be taking 10. I believe the time will be split on the clock. You have 30 minutes and when you sit down, whatever time is left will be set aside. So let's see 30 minutes on the clock. Thank you, Judge. My name is Bill Kirchner and may it please the Court, I represent Howard Cotterman in this case. The questioning that we've just heard this afternoon is trying to establish a limiting principle. Is Arnold in play? Pardon me? Is Arnold in play? I think Arnold is certainly in play because this is an N. Van Karp Court and you could overrule Arnold. Of course we have the authority. The question is whether you have raised that as an issue, whether you have challenged Arnold or argued that Arnold should be overruled. I don't remember seeing it. Your briefs, of course, were filed before the panel. It was drawn by Arnold. I haven't seen any further briefs or anything else arguing that Arnold should be overruled. That was raised below. It was not raised on appeal. We have not relied upon that. This Court, of course, can affirm. I'm not asking you what we can do. I'm asking you what you raised and what is before us. And in some negative way by not answering my question, you're saying you didn't raise it. So you have not given fair notice to the government to brief the question about whether Arnold ought to be overruled. You know, we haven't had a chance to. That was raised in the brief of the amicus and Mr. Hanman can certainly speak to that. I did not raise that though, Judge. Okay. So the question of whether this is a radical concept is really what we're talking about here this afternoon, and I believe that the government's position in this case is a radical concept. Do you have a limiting principle to offer us? I mean, you pointed out the government's difficulty with that. I've got the same problem with your position. What's the limiting principle? What can the government properly inspect, or do we have to say anything that comes in via a laptop computer is fair game? What can the government can do? I don't think it's necessary in this case to say that anything that comes in in a laptop computer is fair game. I think that as Judge Fletcher has pointed out, there is an argument here that a forensic search might be going too far, but we have not relied on that either. I think that's an alternative basis on which this court could rule, and I think that's a perfectly valid basis. But our limiting principle is really seizure. That's what we have based our case on. I guess, yeah, I want to know, do you concede that the government could have conducted its forensic search at the border station? I'm trying to figure out exactly what the objection is. Is it that it's a detailed search of electronic devices? Is it the fact that the search occurred away from the border and took several days or both? But if the search had occurred at the border, would it have been okay? Would you concede that? Or is it it had to be, I think what Judge Fletcher is saying, it only has to be a certain type of search. I'm trying to fashion the appropriate answer, but I want to give you a yes or no answer. And my answer is no, I don't concede that. I think that there are searches at the border that can go beyond what is reasonable, and that would depend on the type of search that they did. You can see a search in the ROM case where they were able to bring their person to the border. They were able to do a forensic search at that time. And this court did not address that. I believe it was raised in the reply brief, so the court refused to address that improperly so. But I think that there is a line. I think for most Fourth Amendment cases the court doesn't draw a bright line and say, you know, you can do exactly three and a half hours or five hours or seven hours. But what the court does is look at what the facts of the case are and decide whether those are past the line. There is a line. What's past the line in this case? What was excessive? What was past the line was seizing the property without reasonable suspicion, taking it away for days at a time and hundreds of miles. Now, is there any evidence that what we'll call contraband could have been found with a lesser effort? I think there is. Number one, Agent Owen testified that he could have done the search at the border. And he also testified that it took something like several hours. He said it might take a little bit longer to have done at the border. In ROM, we see what they can do. They can access the unallocated space, which is exactly where they found the pictures here. And you've got to remember, our argument is not necessarily that they have to find all of the evidence at the border. They only need to find enough to justify further search and seizing. Reasonable suspicion is the only probable cause. Exactly. But how do you know how long you have to look at the computer to find the stuff that generates reasonable suspicion? I'm not technically illiterate, but I don't do forensic searches. And as I looked at the record in this case, I didn't see a lot of dawdling. I didn't see any evidence suggested that could have done this in 20 minutes. And so I have a difficulty coming up with a limiting principle. How far can the government go without going over? You tell us they're over the line, but I can't find the line. Is there evidence that the government took an excessive amount of time, longer than it really should have taken, to review a laptop computer with password protection? Because if you tell me no, there's no such evidence, then I've got to problem figure out where that line is supposed to be. I have the same problem with the government, but we need some kind of guidance. Yes. And I guess the best way to answer that is that if you take people's property away from them at the border for days at a time, what I'd like to do is... What if the search takes days? There is some mention in Supreme Court cases, and the name of the case doesn't come to mind, that a border detention of approximately two hours is to be expected. Well, you know, if you ever ship anything, you know it takes days sometimes at the border to clear customs. Just a FedEx package or a generic messenger package, U.S. mail, DHL, FedEx, it comes here and then you get the tracking information saying it's at the border. And it sits at the border sometimes for days on end, while some customs agent or somebody clears it. That's just the way it is. What's so different about somebody hauling it in on their person than having it brought in by package? I think the big difference is the reasonable expectation of the person. And that is sort of how the whole border search exception is set up. Where does that come from? Pardon me? Where does that come from, the reasonable expectation of the person? Well, I'm drawing that from a number of cases, but I think the Ramsey case talks about what a person would expect at the border, first of all, that the government's powers... Well, let me give you an example. Flores, Montana, they took the guy's fuel tank out to look in for a... That took, I don't know how, but certainly many, many, many, many hours and his car was fully incapacitated. Was that within the reasonable expectation of the person driving to the border? It wasn't. I think that that case is a very good point. It's not unreasonable. I don't know that they held it was reasonably expected of the person driving the truck across the border. They held that it was within the border search exception, first of all, because it actually occurred at the border, which is very different from our case. And secondly, if you look through that opinion, they talk about how quickly they brought the mechanic to the border and how they were able to take it apart and put it all back together again. But it's a very different search. They also talk about the fact that it was a gas tank that was being searched. Pardon me? They also talk about the fact that it was a gas tank that was being searched. It was a qualitatively different search, wasn't it? Exactly. How does this fit in, then, with the concept that, I think it's at ER 13233, that Agent Owen testified that he had forensic software on his laptop that he could have brought to the border that would have enabled him to conduct the search with no trouble at all? What difference does that make when you, like, say, compare that to Flores, Montano? I think the difference that it makes is when you look at the overall reasonableness of seizing people's property and taking it away from them. The border search is, the whole reason for the border search exception is tied to the place where it occurs, at the border, where the government's power is at its zenith, and where every traveler knows they're probably going to be stopped, they're going to be detained for a while, their property certainly may be looked through. Everyone expects that. Because the sovereign has a tremendous interest in not allowing contraband to enter the border, correct? That is absolutely correct. All right. But now, just because people carry computers or, you know, because of technology, does that somehow limit the government's interest in protecting what comes through the border? It doesn't limit the government's interest in it. Their ability? Pardon me? Their ability? What it limits or what it affects is what's reasonable. And part of the reason for the border search exception is because that's the way it had always been done, that's what people expect, but nobody expects that you're going to go to the border, they're going to search through your stuff for hours, they're going to keep you there for eight and a half hours, they're going to question you, and when all of that's done and they've found nothing, they're still going to take you. You say that, but I'm not sure that's true. I think most people expect to go through without a hitch, and most of the time that happens, but why isn't this an implicit infestation that if they choose to, they can point to you and say, you know, we're going to search your luggage, and you go through the lines, I have nothing to declare, I have nothing to declare, if you're coming to LAX, for example, and then they point at you and say, you know, we're going to search your luggage, and they don't have to have any reason at all, and then they take as long as they want to search your luggage. Why isn't that part of people's expectation? And if you have stuff that takes a long time to search, then it takes them a long time to do it. Why isn't that part of people's expectation? Well, the distinction I'm making, though, is it's not the amount of time that it takes, it's that when they're finally done searching and they've found nothing, then people don't reasonably expect that their items are going to be taken away from them. Because they weren't done searching. I mean, the premise of your question defeats the question. Suppose they're not done searching. Suppose to finish their search, they take it to Tucson. So what? Well, that has interposed a seizure between the search that they first did and the search that found the car. But the government's response to that, which you haven't really responded to, is, we started a search, and we continued the search. So there's no break in the search, according to the government. It's all a continuous line. What is your response to that? I think that what they're trying to do is create an artificial distinction that doesn't make sense in the real world, to say that that search has just begun at the border, and now they can take it, and the border envelops it like a cocoon wherever it goes. That is not the real world. What happens in the real world is people can tell when their goods have been taken away from them. And that's exactly what happened in this case. It seems to me that if I were to really accept your argument, I have to accept the premise that electronic devices are different than other properties. And the flip side would be, to accept the government's argument, I have to say that the Fourth Amendment doesn't distinguish in terms of property between electronic devices and other properties in the case. So it seems to me you're asking to treat computers differently. Nothing could be further from the truth. Our argument is not based on computers, and I don't believe that their argument is based on that either. You were saying, but when I talked to you previously and I said, okay, if it's a border search, that if they did everything there, would that be okay? And you said, well, no, because at some point they can't go, you know, you're saying, well, they can only do certain things in the computer. So it seems to me that you're asking to have computers treated differently. I think that's not correct, because what the government's argument is and the way that the panel decision is written, this could apply to anything. It doesn't necessarily just apply to computers. Their argument is it's at the border. Once we start our search, we can do anything. It's not based on it being a computer. What I'm saying is that it's the same for any type of property. Well, let's take, for instance, Montana then. So at that particular border, they had a mechanic. Let's say they go to a different checkpoint. What's the next checkpoint? East. You know, a smaller checkpoint. And they don't have mechanics.  Let's say it's something even smaller than Israel. I've been to those. You know, so there's no mechanic there. And they decide, you know, the easiest place to do it is to drive. The fastest way to actually get this gas tank searched is to drive it into San Diego. You know, drive it into someplace where there's a mechanic 50 miles away. And so they would be seizing the car and taking it somewhere without reasonable suspicion. You know, that's such a nasty word, seizing. You know, they're entitled to, you know, Supreme Court said they're entitled to take over the gas tank to look for a contraband. They don't have the means right there. The sort of quickest way to do it or the most efficient or at least costlier way of doing it is to drive the car to the mechanic and have him do the operation. You would distinguish that case of Flores-Montana? Yes. I think that if you look closely at the Supreme Court's published opinion, they talk about the fact that they were able to bring their mechanic there and so forth as being important facts. I understand that's what they said. I'm just saying, you know, we now have a different case and you would say that would come out differently. Yes. Because the suspect is clever enough to go to a border station where they don't happen to have nearby the kind of person that specializes in that kind of search. That sort of turns into a game, doesn't it? It means that if you have contraband and you hide it well, you will seek out the border station farthest away from some place where they're likely to have a mechanic or a forensic expert or somebody who knows electronics or somebody who knows chemicals. Well, what about the substance? They look at it and they say, you know, this really looks like a suspicious substance to us. But, you know, we've done a test for heroin. It's not heroin. We've done a quick test for methamphetamine. It's not methamphetamine. We sort of went through our entire array of assays that we have here. It's none of those, but to us it really still looks like something really nasty. But there's a chemical lab 50 miles away that has many more tests. The answer is you hang it back and you say, good luck, you know, see you later. Well, the answer is going to hinge on whether there is reasonable suspicion in that case. If it's just something that they want to test for no reason, that's why I'm saying it's not necessary. It's a bag. It says flour on it, you know. It's a 50-pound bag of flour. They look at it and say, you know, we're just not convinced it's flour. We don't think it's flour. We don't have anything we can articulate to say it's not flour, but we've tested all these other things. It doesn't test positive for any of those drugs. But in doing a good face search for confidant, we think we need to do one more test for somebody who has more chemical tests available. And that person happens to be 50 miles away. And what we're saying is if there is no reasonable suspicion, then that material should not be seized. So you want the government to put a lab at every crossing point? Absolutely not. I don't think it's necessary. And, first of all, our case should be. What do you say not be seized means you hand it back to them and let them take it wherever they want, right? If there's no reasonable suspicion. And I think your hypothetical sort of incorporates the fact that there is reasonable suspicion because they've got a 50-pound bag of flour, but it doesn't look like flour, I think that's very suspicious. I think this is called fighting the hypothetical. I posit that they don't or they choose not to bring it or, you know, for whatever reason, they can't articulate it. So the answer is you hand it back and you say hasta la vista. That's what we would say if there is no reasonable suspicion and if there is no way that it can be tested at the border. If you make any distinction between the fact that this was hand-carried to the border, let's say that he was in Mexico City and says I'm going to ship a bunch of CDs and my computer to San Diego. So it comes in through the port of entry in San Diego. They figure computer, CDs, I don't need any suspicion. I'm going to run these through forensic testing, but I actually have to send it over to Tucson to do that. So it goes over to Tucson. Same guy comes through the border at Otay Mesa with a computer and a bunch of CDs. They do all the testing they did on Mr. Coteman, but they say, you know, I still think we need more testing. We better send it to Tucson. What's the difference? I think the distinguishing principle is that when a person ships a package in commerce, they give up possession. And to me, that's really the essence of our case is possession of your goods when you get to the border. That's your computer, that's your glasses, that's your wallet, your clothes, anything the government could possibly be suspicious of. But you haven't given up possession of those like you have in a shipping case. And let me ask you, though, on a computer, I found your earlier response a little puzzling to say that it really didn't matter that it was a computer. Because it seemed to me that in the gas tank case, somewhat preposterously, they argued there was some right of privacy in the gas tank. But, you know, the Supreme Court didn't buy that, of course. And they said there's really no right of privacy in the gas tank. So are you saying, well, it doesn't matter anyway what expectation one might have vis-a-vis a computer, that it's basically the same as a gas tank? I don't think that's the right way. That's not what we're saying. What we're saying is there's a difference between the right of privacy and the right of possession. That's really what I'm saying. And I think anybody who comes to the border knows that their possessions may be searched. The extent of that search, I think, has not been nailed down. And that's where you keep talking about reasonable suspicion, right? Yeah. If I'm understanding your argument, you're saying, OK, Arnold says, among other cases, you can search at the border. And, of course, the Montagna case with the gas tank, you can search at the border. How do you cabin that? Your point is if you're going to keep it too long or if you're going somewhere else, you've got to have reasonable suspicion. Is that your position? That is our position. And it's based on the analysis of the district court that this was an extended border case and reasonable suspicion is required for that. But even if the court doesn't think it's an extended border case, there still should be some limit that it's different to search. But we don't need to get to that. If we agree with the magistrate judge in his analysis that this is, in fact, an extended border search, then the case law is pretty clear about reasonableness, right, and how probable cause factors into it. What really would be new is what I understood the government to argue, which is that the border is elastic. There is no extended border doctrine. As long as you are searching items that have to go through custom, you can pretty much do whatever you want. You can take it out somewhere else. And as the chief mentioned, if the mechanic is down the road a few miles, that's okay. Or if you need to go to some specialized forensic lab, that's okay. I gather you take strong position that even the border doesn't work with that, right? That is exactly right, Judge. And I think, like I said, the distinction that we're making is the interest that a person has in their belongings being looked through at the border as opposed to their belongings being taken away from them. I see that my time has expired for Mr. Hammond. Okay. If there aren't any other questions, I would just like to close with one other thought from what was said earlier today, and that is I think that the government is asking this court to create this legal fiction that there's no difference between searching your items at the border and searching them hundreds of miles away days later. There is a difference. Any traveler would know it. You and I would know it if they took our stuff away at the border. And that's the limiting principle that says they should have reasonable suspicion before they do that. I'll turn the floor over to Mr. Hammond. Thank you. Thank you, Your Honor. Christopher Hammond for the Constitution Project. There are two rules of varying breadth that have emerged from arguments today that can be used to resolve this case. The first doesn't turn on the nature of the device being searched. It's a straightforward application of the extended border search. And the bright line rule is simply when the government takes an item, whatever that item may be, away from the border or its immediate environment, that's an extended border search. What difference does that make to the person whose item is taken away? How does it matter that it's taken away for five days and searched at the border or taken away for five days and searched in Tucson? It matters very fundamentally to the possessor interest of that person. If you are traveling, particularly with something as important as a laptop or as important as a diary or a journalist's notebook, and that's seized and held on for days on end and taken away from you, that impedes... That's the geography. My premise was five days either place because you're drawing a geographical difference and I'm trying to figure out what's the geographical difference have to do with anything. The geographical difference has to do with the government arbitrarily separating you from your property. It's just as separated at the border. No, it's not. How is it not just as separated at the border? Because at the border, you at least can be there. You can be at the border, but does he have the right to accompany the laptop wherever it goes? Suppose they take it into a crime lab they've erected at the border. Does he get to go with it? He's entitled to, in this case, he was asked to accompany them, and it does make a difference. It makes a difference with the possessor interest. When you take that item away, that is a... But you still can't use it. I mean, they weren't going to let him touch it because they were afraid he was going to delete things. So I think what Judge Clifton's saying, you know, and you may not even have a right to watch what they're doing. Yes, but the... And you don't get to use it because then you can destroy evidence. Correct. But this gets to the very reason why no court has ever recognized a functional equivalent of a border or the border when the government has taken an item away. And the government will not be able to find that. All of the... I don't know how long the other way either. I mean, this appears to be a different question. Well, it is, and that gets to an important point about the very nature of the border search doctrine. It was intended to be a narrow exception, as this court has articulated. And two important limiting principles have ensured... The sovereign at its zenith doesn't sound very narrow to me. But what is the purpose for the sovereign's zenith interest? It's only two things, to keep contraband out and to impose duties on items coming in. It's never... Well, if they weren't allowed to search this computer thoroughly, they wouldn't have succeeded in keeping contraband out. Well, this gets to the second rule where it does turn on the technology in the item coming across. Because what the government is insisting on is a forensic search of a laptop computer. That, as a practical matter, when you don't have reasonable suspicion, underscores the lack of a limiting principle here. Because the government, with a forensic search, can examine an 100-gigabyte hard drive for evidence of any criminal wrongdoing or for any criminal statute. The framers of the Fourth Amendment couldn't anticipate where technology was going. It was just to keep us free from unreasonable searches and seizures. So, I'm having a hard time saying... If we want bright lines, if we want things that people can understand, I think the Fourth Amendment has to be elastic to recognize new technology. It does. But it's not a one-way ratchet. The government is identifying unique aspects of technology for why it needs to have some radically broader power than it's never enjoyed before. But it also imposes particular damage to privacy and the interest in dignity and liberty that has never been implicated by any other type of property. But your position, as I hear it, would say, because of these overriding privacy factors peculiar to an electronic device, you couldn't even do a forensic search at the border. Is that your position? That is our position. And that gets to the nature of this device. And that's a position that no court has ever taken either, right? And no court has rejected that point. It's never been... It's always a first. It is. And I think this court is... Doesn't Arnold reject that? That's what Arnold says. No, I don't think so. What Arnold says is that you cannot do a... You're entitled to do a search at the border. But there's a very important qualitative difference in the nature of that search. To draw an analogy to this court's en banc decision in Selgin, it's the difference between skimming correspondence and reading it aggressively word for word. The difference between the search in Arnold was booting up a computer and an agent flipping through files manually. Here, you're talking about an extensive, thorough examination of every single file, byte, bit, and data in that hard top. That contains a much more extensive range of information and a far more intrusive... Actually, the argument that was made to Judge Dean Pregerson was that a computer was like your brain, and that you can't go in there because you've got to have a search warrant for every neuron. And he upheld that, and we reversed it in Arnold. So that argument was made and rejected, and Arnold says contrary to what you're saying. But Arnold, the search in Arnold was much less intrusive. That's exactly right. And I don't think Arnold actually... Certainly, the question of forensic searches was not pressed or passed upon in that case. And I do think it makes at least one very important difference, and just to take a practical example, the forensic searches that the government wants to do and, in fact, has done here and emphasized why it needs to do them is to be able to uncover deleted items that someone has deleted. That, I think, is particularly problematic because there is no analogy. In the past, if you brought a suitcase across and you wanted to leave something out of your suitcase, you could leave it out. The government could never find it. It would be as if the government had a technology to scan your suitcase, identify all of the items you used to pack on all of your vacations or all of your business trips or any of your litigation correspondence or your medical records, even though you chose to leave it out. But the government argues and they insist... There's not quite the right analogy. It's sort of like you leave it out but have a string on it and you can pull it across the border when you're across because the deleted items, if they're in your trash can, you can recover them. If they're not in your trash can, they're easily enough recovered from the blank space in your computer. It's not hard. It's like you left trace evidence in your suitcase. From the map or whatever. You leave a trace on your computer. I think it's a little bit more problematic than that because for many people, particularly unsophisticated people using laptops, they think they've put something, they've taken it away and suddenly... Well, they're wrong. The fact is, if you bring something in and you think you left it behind but you did a bad job of it, then you've got a problem. I mean, if you really want to delete, if you really, really massively delete it and override it, then it's not going to be there and nobody's going to find it. I mean, the little garbage can, we all know, doesn't mean it's in the trash on the computer. Yes, yes. We do know that, but I do think the important point, whether it's... Even the flush sound doesn't flush. The important point, I would say, is regardless of whether it's deleted or not, this does represent a far more extensive search. And I just... Just to cut to the chase, you're saying not that they can't do the forensic search but that they would have to then have reasonable suspicion? Exactly. And that is important to emphasize, that this is not an onerous standard. This is a modest burden that courts, that agents, trained agents are able to do. But the fact that the government is insisting on this power to perform a forensic search without reasonable suspicion, it's important to understand what that means. This is going to give the government the opportunity not just to root out contraband, and in the case of deleted files, to resurrect contraband, but it's also to flush out any evidence of criminal wrongdoing. They say just that at page 46 of their opening brief. It sounds to me like you're taking on Arnold. No, I don't. Well, I think that we would welcome, as amicus, that this court revisit Arnold, but I do think that this court can sensibly resolve this case and draw a bright line. There's a constitutional difference, I believe, between clicking on an icon on a desktop and having a trained forensic scientist systematically scour a 100-gigabyte hard drive and uncover and be able to identify all of the private familial, religious, social, professional types of obligations that exist. A 100-gigabyte is really tiny. Do the scanners that they're now using at the airport on the outbound, where they now can do the body X-rays, do those transgress? Aren't those similar to what you're suggesting? That is, now they can go beyond the clothing. They can look at the body. So if they could do that at the airport to protect against people getting on airplanes, why can't they also apply forensic techniques to a laptop or an iPad or whatever on the inbound, which is something like a technological, functional equivalent of those body scans? Well, no, I don't think so. I mean, if anything, I think it's actually far more intrusive to root through someone's most prized and personal and private correspondence. As opposed to their body. Well, the way they've done it here. They're not doing it at Cavity. They're not doing it. No, I'm trying to draw an analogy, I mean, because, in fact, the technology has been developed by the government to deal with ways people hide things that pose a threat. Okay, the government, presumably, can develop forensic techniques that go beyond and bypass passwords or whatever that allow them to peer into computers. Maybe not as deeply as a full forensic search. But if your principle is that you can't go beyond what, in Arnold, he booted up, and they were able to see things on his computer, but, as we've heard today, you can't get past the password, then what you're suggesting is they're stuck. They can't look at what I've got on my iPad or what you've got on your laptop, because we've got a password protected unless they have reasonable suspicion. Is that your position? It is, and I don't think that there's a – first of all, to draw the proper analogy with the airport, as I understand the regulations, anyone can opt out of that advanced screening and get a pat-down. So I don't – to the extent someone's perceiving that as a particular intrusion on them, they can opt for a different route that's less intrusive. Well, that's in the eye of the beholder, it turns out. But I do think that, at the end of the day, that the prohibition on forensic searches provides this court with one bright-line rule that doesn't require the court to revisit Arnold, and it does allow – it promotes predictability and certainty. I also think the other route is the extended border search. You move something 170 miles away from the border, and the government has had no justification. In every other case they've cited where it has been searched somewhere else, it's been the functional equivalent of the border. And the key difference between cargo and something on your person, to get to the Judge McEwen's question, is that the cargo, in all those cases, was searched at a place of its intended destination or its intended route on the airway bill. That actually makes a difference. It would have been, I think, an entirely different case if the government, when it got to St. Louis, decided let's ship this over to D.C. for an investigation. You don't have that here. And I think either of those rules provide this court with a meaningful way to dispose of this case. Thank you. Thank you. You had about a minute and 58. That's what it was. All right. I'll be quick. I just want to comment on a few things here. First of all, I believe that Judge Callahan asked a specific question. I just want to clear up that the defendant did concede in oral argument and in the brief that if this search had occurred on the border, it would have been lawful. So that raises another issue that the scope of the search in relation to this whole forensics versus not forensics versus search of computer was never really raised. I believe, as Mr. Kirchner said, that it was raised at the trial level, but it was not raised on appeal. So I just wanted to clarify that. I also want to note that in relation to the searching of unallocated space and the limits of trying to draw a bright-line rule that forensic searches can't be done if they're searching unallocated space, contraband can be found in unallocated space. Child pornography can be found in unallocated space. And I believe, Judge Kosinski, you noted yourself, it's like having a string on it. It can be retrieved. So I just wanted to make that that's clear. Let me just make sure I understand. As we know, many people bring devices in, laptops and all these things, iPads and things like that. So let's say this happens to you. Ordinary citizen. Almost everybody, I think, has a password on them. You boot it up, it has a password. iPhones and all that. And you say, look, I want to be very cooperative. You know, I'll give you my password. So the agent takes the device and says, okay, what's your password? And you say, give me the password. And so they get into it. And whenever they get to anything, the owner is cooperative and says, you know, here's, you know, if you need further passwords or access to anything of that sort, or if there's a program that needs a separate password, I'll give you that. I'm just wondering, as far as the government is concerned, no amount of cooperation on the part of the computer owner will exempt them from a forensic search, because it's the government's position that there could be more stuff in there that's hidden that you just can't get at with just looking at it by applying passwords and sort of normally using the computer the way a normal user would use. Yes. I believe that it is to the discretion of the customs agent that is doing the search, whether they accept the assistance that you're describing, passwords. Or even if they do accept it, this would not preclude the possibility that there are hidden partitions or that there are simply files that are mislabeled. You know, it says, you know, it's a PDF file, but actually the extension is GME. It really is an EXE file, you know, or a movie file. So you can't tell these things until you do a forensic search. So the government's position, as I understand it, is that anybody that comes to the border and brings such a device, which I think most people do, you know, a large percentage of them, no matter how cooperative they are, no matter what, the political engines get the whim to think, you know, for whatever reason, this device, I've looked, I've done all the looking I can with the help of the owner, and I'm still not satisfied for whatever reason. The government can hold on to it and can hold on to it for as long as it takes, at least as long as time to do a forensic search. I believe that if that's necessary for it to be cleared by customs, then yes. You agree that if, for example, say it was put in storage for two years and get to it in two years, that would be different? I think that would be different. But if they take it away and do reasonable efforts to find somebody who's forensic, they don't have to give a reason at all. That's the government's position. That's correct. And is it true that they could really, besides looking for pornography, another thing that would be coming through potentially, of course, would be copyrighted files that should not be uploaded? Would it be that they can actually look for all other evidence of crime that shouldn't come across the border, whether it's money laundering, drug trafficking, intellectual property infringement? Basically, once they have the computer, they can look for anything they want? That's a good question. I believe that generally the customs agents that are at the border have the duty to, the case law seems to list in statutes like three categories. It's basically contraband, determining whether the person themselves is admissible, and there's a whole litany. But they do seize contraband IP, pirated IP, correct, at the border? Yes, in the actual mean of like specific items that are contraband. I don't mean just knockoff purses. I mean if they go on there and they find out that there's all kinds of illegally downloaded files, would there be anything to preclude them under your theory from looking for that kind of contraband as well as drug or other? If that item is considered contraband, then no. I believe that the government can go in and look for any type of contraband that's not admissible into the country. Whether that is under the legal terminology considered contraband, I'm not sure. Your Honor, I'm not sure. I appreciate that. But I would say that, yes, looking for contraband, the government could go and look for contraband. They can look to determine if there's anything to indicate the person is not admissible. For example, the documents they are showing. Identity theft. Identity theft, or also if something requires a duty. And those are the three categories. I know that in U.S. v. Selgin, this court discussed this issue of whether evidence of a crime can be searched for, and ultimately I'm not sure that it's quite clear that that is the case. But in this case, it's really not the facts of this case. This case involves contraband. Can I ask? I just want to be sure I understand the government's position on what exactly is required to conduct an extended border search. Three to four, it's always been clear in my mind you've got border searches, you've got extended border searches, and you've got functional equivalents. In order to lawfully conduct an extended border search, if for a moment we don't agree that the border is elastic, you have an extended border search, what must be shown before you're allowed to do that? What are the elements? Extended border search requires reasonable suspicion, and basically the reason is from the case law shown to be because the item or the person has cleared customs and entered the country and entered the normal stream of commerce and thus has a heightened expectation of crime. Okay, so you're saying that the facts of this case simply don't involve an extended border search because Mr. Cotterman had not cleared customs. Mr. Cotterman himself had, but the computer had not. Okay, so the computer had not, and so you want us to analyze this case on that basis, that this is a border search, it's not functional equivalent, it's not an extended border search. Well, and let me be clear. Border search and functional equivalent is basically the same analysis. There's no reasonable suspicion. The only difference is the functional equivalent cases involve a person that didn't happen at the physical line of international border. So you're saying that the same criteria, for example, under Abuchi, those criteria you believe also apply to an extended border search. That's a functional equivalent case. Abuchi is a functional equivalent and it is not an extended border search. But are you saying that the same criteria, which in this case is the totality of the circumstances, and whether there's reasonable suspicion, do those two elements also apply to an extended border search? I'm not sure I understand your question, but yes, an extended border search would require reasonable suspicion and the factors that I just indicated, that an item has cleared customs and entered the normal stream of commerce. There is a case, if I have to think of a name that's escaping me right now, where an item was shipped, so similar in a sense to Abuchi in that sense, and then it was attempted to be delivered to a home numerous times, and then it was searched after that. And that was analyzed under the extended border search, I would argue because of the concept that it had cleared customs. It had already entered the normal stream of commerce in the sense that it had tried to be delivered. Thank you. Thank you. Okay. This argument stands submitted. We're adjourned.
judges: Kozinski, Fletcher, Thomas, McKeown, Fisher, Gould, Clifton, Callahan, Smith, Murguia, Christen